UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Semore Gilchrist, Jr., | ) | Civil Action No. 4:03-3026-TLW-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | REPORT AND |
| | ) | RECOMMENDATION |
| Beneteau U.S.A., Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on defendant's motion for summary judgment filed September 2, 2004 (Document # 7). Plaintiff filed a response on October 14, 2004, in opposition to defendant's motion and the matter is ripe for disposition.

**Facts**

After working for International Paper, plaintiff was laid off in December 1998. After holding a number of short term positions with various employers, plaintiff was hired by defendant on July 17, 2000, to work at defendant's facility in Marion, South Carolina. At the time he was hired, plaintiff was enrolled in and attending classes at Fayetteville Community Technical College in Fayetteville, North Carolina, as a student of mortuary sciences. Travel between defendant's facility and Fayetteville Community Technical College takes approximately two hours.

Defendant is a producer of large sail boats. Plaintiff was hired in July 2000 as a laminator. He worked the hours of 7 a.m. to 3:30 p.m. and overtime hours on Saturdays. Subsequently, plaintiff became interested in obtaining a spray applicator position with defendant. Plaintiff was interested because of the work and because the hours suited his school schedule. (Plaintiff Dep. at 24). He

-1-

discussed this with Jim Logan, the Mold Room Manager. Mr. Logan knew that plaintiff was attending night school, and because becoming a spray applicator involved an extensive investment of time and over $100,000 to fully train a spray applicator, Mr. Logan sought some assurance from plaintiff that he was serious about working as a spray applicator for a long period of time. (Logan Dep. at 32-34) On this point, plaintiff testified at deposition as follows:

> Q:  Did you tell him at that time that if the choice came between Fayetteville Tech and Beneteau that you would choose Fayetteville Tech?
>
> A:  I told him at that time if the day comes where the shift had to change, could they make some other arrangements so that I could still go to school, and he said he didn't know.
>
> Q:  So you told him that you had a lot invested at Fayetteville Tech?
>
> A:  Yes.
>
> Q:  That was your top priority right now?
>
> A:  Yes.
>
> Q:  That as long as you could be a spray applicator and have it not interefere with your schoolwork at Fayetteville Tech that you would want to do that, and you asked him whether, if the day ever came that they had to change shifts, they would be able to find something else for you to do so your would still be able to go to school?
>
> A:  Yes.
>
> Q:  And do I understand you to say that Mr. Logan told you at that time I don't know?
>
> A:  I think that is what he told me. But I told him that school is my first priority.
>
> Q:  Did you go into that spray applicator position with the understanding that anybody was guaranteeing you that your hours would never change?
>
> A:  I went into the position that Jim Logan told me that my hours would be from 3:00 in the morning to 12:30 p.m.[1]
>
> Q:  And if that ever changed he didn't know whether he would be able to find another position for you?
>
> A:  He shook his head, well, - - I don't remember his exact words, but - - I don't remember his exact words.
>
> Q:  Do you recollect him saying anything to the effect that if the hours

---

[1] Mr. Logan testified that it was made clear to plaintiff that his hours would be varied. (Logan Dep. at 35).

> that we need you to work as a spray applicator ever changes and it
> interferes with your schooling, I promise you we will find you
> something else to do so that you will have a job that doesn't interfere
> with your school?

A:     I don't remember anything like that.

(Plaintiff's Dep. at 28-30). Plaintiff received the spray application position in November 2000, and worked the 3:00 a.m to 12:30 p.m. shift.

Shortly after plaintiff became a spray applicator, defendant's management determined that its production needs would best be met by having a second shift of workers applying gel coat to smaller parts of the boats later in the day.[2] Accordingly, defendant's management created a shift in January 2001, to work from 11:00 a.m. to 7:30 p.m. (Late Shift). Willie Page, an African-American and a spray applicator, volunteered to move to the Late Shift. Mr. Page subsequently quit and Mr. Logan approached Josh Joye, a white employee, and informed him that he was being assigned to the Late Shift. Mr. Joye initially quit rather than accept the transfer. However, he returned the following day and agreed to the move. (Plaintiff Dep. at 35-36).

Several months later, in March 2002, defendant determined that it needed another spray applicator on the Late Shift. Because plaintiff was the least experienced spray applicator working on the day shift, Mr. Logan approached him and informed him that he was being assigned to the Late Shift. Mr. Logan stated at deposition that he moved plaintiff because he needed his two best, most experienced sprayers, Johnnie Collins[3] and Larry Cross[4], on the day shift. (Plaintiff Dep. at 36,45;

---

[2] Mr. Logan testified that the more experienced spray applicators needed to be on the day shift which preceded the lamination crews by three or four hours. (Logan Dep. at 35).

[3] Mr. Collins is white.

[4] Mr. Cross is African-American.

Logan Dep. at 65-66).[5]

Plaintiff resisted the transfer and told Mr. Logan that school was his top priority. Mr. Logan suggested that plaintiff put his schooling on hold and accept the assignment.[6] (Plaintiff's Dep. at 43). Plaintiff informed him that he would lose his tuition and would flunk the courses. (Plaintiff's Dep. at 43). Mr. Logan told him to think about it and would not accept an answer on the spot. (Plaintiff Dep. at 44). Mr. Logan told plaintiff that if he was not willing to work the Late Shift, he needed to terminate his employment. (Plaintiff's Dep. at 56). After giving plaintiff about a week to consider the transfer, Mr. Logan and Jennifer Reinman, defendant's Human Resources Manager, met with plaintiff and asked for his final decision. Plaintiff refused to be transferred to the Late Shift and his employment was terminated.

Plaintiff is not aware of any other employee who was assigned hours, refused to work them and was not terminated. (Plaintiff's Dep. at 84).

Plaintiff testified that he believes race motivated the decision to move him to the Late Shift

---

[5] Plaintiff does not question the sincerity of Mr. Logan's belief that Collins and Cross were the more experienced, best spray applicators. (Plaintiff's Dep. At 36,45). He does question whether or not it was necessary to create, or move him to, the Late Shift as opposed to extending the day shift work hours. (Plaintiff's Dep. At 47). Mr. Logan decided to move plaintiff to Late Shift because of needs of production, his skills, and the fact that in order to enable defendant to produce more parts, they needed to have his skills in the Late Shift hours. Plaintiff's skills were not of use in an efficient time manner in the day shift. Plaintiff was gaining skills and abilities on interior parts of the boats and the gelcoat applied in the later part of one day can be worked on the beginning of the following day at the very beginning of the shift with no detriment to the part. The exterior parts cannot be gelcoated the previous day because it will not stay on the mold and the quality defects would be massive. Plaintiff had been trained and was capable of assisting with mold preparation which was only of value on the Late Shift. (Logan Dep. at 64-66).

[6] Mr. Logan advised plaintiff that just as this change in work hours was occurring, another change could occur which would allow him to continue his education. (Logan Dep. at 38).

-4-

and to terminate his employment. (Plaintiff's Dep. at 67,95,138). Defendants state that plaintiff was a valued, good employee. (Logan Dep. at 66; Reinman Dep. at 59). Mr. Logan testified that he would have considered moving plaintiff back to a laminator position but that request was not presented to him by plaintiff. (Logan Dep. at 67).

Plaintiff was replaced by Robert Strickland, a white employee, who did not prove to be a good employee and was terminated before he finished probation. (Plaintiff's Dep. at 67; Logan Dep. at 68-69). Barry Floyd, a white employee, is currently occupying the spray applicator position and is not working the Late Shift.[7] (Plaintiff's Dep. At 67). Plaintiff does not know if the Late Shift still exits. (Plaintiff's Dep. at 67).

Plaintiff presents several examples of how he believes African-American employees are treated less favorably than white employees. Plaintiff states that a Ms. Esther told him African-Americans and whites "didn't make the same money." (Plaintiff's Dep. at 68). Plaintiff testified that he was told that Larry Cross received raises sometimes but Johnnie Collins made more money and received raises after every review. (Plaintiff's Dep. At 69). Plaintiff testified that he did not know who, Collins or Cross, had been employed with defendant longer. (Plaintiff's Dep. at 70). Larry Cross would refuse to sweep the floor and plaintiff was assigned the duty and believes race had something to do with it. (Plaintiff's Dep. at 72-73). Elaine Elliott, wife of Kenny Elliott, a supervisor, was allowed to take rest breaks in the air-conditioned office while other hourly employees were not permitted to do so. (Plaintiff's Dep. at 103). In describing what a supervisor, Will Collins, said at some point in time, plaintiff testified, "Like what I said, about the jews and the

---

[7] Mr. Logan testified that Mr. Floyd worked the day shift for the first few weeks while he was learning the job before assuming the Late Shift schedule. (Logan Dep. at 68-69).

blacks should have been in 9/11. They would be talking about different events that came on TV, but they was talking about 9/11." (Plaintiff's Dep. at 115). Plaintiff testified that Jim Logan was in the crowd when this statement was made. (Plaintiff's Dep. at 115).

Plaintiff presents the affidavit of Gwen Worley in support of his position. Ms. Worley states that she is African-American and took maternity leave at approximately the same time as a white co-worker, Amy Telliho whose father, brother and paternal grandfather are employed with defendant. She states that she was a good employee but was not offered her job back after maternity leave while Ms. Telliho was not a good employee and was offered her job back. She believes race played a role in defendant's decision to not rehire her.

Jennifer Reinman and Jim Logan testified that Ms. Worley was not a valuable employee. (Reinman Dep. at 52; Logan Dep. at 45). Additionally, of the four women who took maternity leave, all but Ms. Worley were rehired. (Logan Dep. at 45). Two of the three that were rehired were African-American. (Logan Dep. at 45).

Plaintiff presents the affidavit of Keithan Sanders. Mr. Sanders resigned from Beneteau on September 2, 2004, after five years of employment. He states that African-American employees were treated less favorably than white employees in that violation of company policy resulted in reprimands for African-American employees but white employees were seldom reprimanded. He also states that Kenny Jackson made false reports about the quality of his work and falsely reported that Larry Cross was asleep on the job, both of which resulted in disciplinary actions. He states that he received a two-day suspension after he used offensive language to Kenny Jackson but white employees were not disciplined for using offensive language towards Kenny Jackson.

Mr. Sanders also states that previously there was never a Late Shift at Beneteau and shortly after plaintiff's employment ended, the Late Shift was terminated.

Mr. Sanders states that he resigned because of the atmosphere in the mold room were he worked.

Mr. Logan testified that the reason Mr. Sanders received a two-day suspension involving the incident with Mr. Jackson was because it involved a physical threat of violence. (Logan Dep. at 51,59). This aggravating factor was not present in incidents involving other employees. (Logan Dep. at 51, 59).

Plaintiff presents the affidavit of Larry Cross. Mr. Cross was employed in the molding division for eight years. He states he was fired because he was falsely accused of sleeping on the job. He states a white employee sleeping on the job was not terminated. He believes white employees were treated more favorably than African-American employees and that Jim Logan and Kenny Jackson schemed to change plaintiff's work schedule to force the termination of his employment.

Plaintiff also presents the affidavit of Willie Page. Mr. Page states he knew that plaintiff would eventually become a target of Jim Logan, and that the Late Shift was terminated shortly after plaintiff left the employ of defendant.

Mr. Page states that African-American employees were reprimanded for inadequate work performance while white employees were not. Additionally, he states, African-American workers were disciplined for disruptive behavior while white employees were not, and that company disciplinary policy was not enforced against a white employee.

Mr. Page also states that Derrick Jacobs, an African-American, was over-looked for promotion until gossip within the company caused Jim Logan to promote Mr. Jacobs.

Mr. Logan testified that Larry Cross was found asleep on the job and was terminated. (Logan Dep. at 48). He testified that Derrick Jacob's promotion was announced on the same day as other supervisor promotions, and that other African-Americans were promoted. (Logan Dep. at 52,63).

## Analysis

Defendant files its motion pursuant to Rule 56, Fed.R.Civ.P. The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

Defendant asserts that it is entitled to summary judgment on all causes of action alleged by plaintiff.

### §1983 Claim

As correctly noted by defendant, plaintiff makes no allegation of and presents no evidence of state action to support a claim under 42 U.S.C. §1983. Therefore, defendant's motion for summary judgment should be granted on this cause of action.

### Intentional Infliction of Emotional Distress Claim

Defendant also seeks summary judgment on plaintiff's claim under South Carolina Law for Intentional Infliction of Emotional Distress. Plaintiff argues that he was employed for almost two years with defendant, endured unwarranted monitoring of his work, and endured subtle racism and racist comments involving the 9/11 terrorist attach. He argues that this made his job border on unbearable and that defendant's agent, Jim Logan, knew or should have known that severe emotional distress would result from his actions.

Plaintiff's claim wants for jurisdiction. The South Carolina Worker's Compensation Act provides the exclusive remedy for employees who sustain work related injury. S.C. Code Ann. §42-1-540 (1985). An exception to the exclusivity of the Act exists where the injury is not accidental but rather results from the intentional act of the employer or its alter ego. Edens v. Bellini, 597 S.E.2d 863, 969 (S.C. App. 2004). Only "dominant corporate owners and officers" qualify as the alter ego of the employer for the purpose of the exception. McClain v. Pactiv Corp., 602 S.E.2d 87, 89 (S.C. App. 2004)(citing Dickert v. Metropolitan Life Ins. Co., 428 S.E.2d 700,701 (S.C. 1993). Supervisory employees do not qualify as "dominant corporate officers" of an employer. Dickert, 428 S.E.2d at 701.

-9-

Plaintiff has failed to show that Jim Logan was anything more than a supervisory employee of defendant. Under the facts presented, the acts of Jim Logan cannot remove the plaintiff's claim against Beneteau from the exclusivity provision of the Worker's Compensation Act. Therefore, plaintiff's claim fails.

### Title VII Claims[8]

There are two methods of proving a case of intentional discrimination under Title VII: the method set forth in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989) (mixed-motive) and the method established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)(pretext)[9].

Under the <u>McDonnell Douglas</u> analysis, plaintiff has the initial burden of demonstrating a *prima facie* case of discrimination. To establish a *prima facie* case, plaintiff must show (1) he is a member of a protected class; (2) he was qualified for his job and he was performing at a level that met his employer's reasonable expectations; (3) he suffered an adverse employment action; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances.[10] <u>Bryant v. Bell Atlantic Maryland, Inc.</u>, 288 F.3d 124, 133 (4th Cir. 2002). The fourth element can be established by presenting evidence raising an inference of discrimination. <u>See EEOC v. Sears Roebuck & Co.</u>, 243 F.3d 846, 851 n.2 (4th Cir. 2001)(citing <u>Texas Dept. of</u>

---

[8] The elements of a prima facie case of employment discrimination are the same under §1981 and Title VII. <u>Gairola v. Common wealth of Va. Dept. of Gen. Servs.</u>, 753 F.2d 1281, 1285 (4th Cir. 1985).

[9] The <u>McDonnell Douglas</u> analysis was refined in <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502 (1993), and <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, – U.S. –, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

[10] The fourth element can be satisfied by showing that the position remained open to or was filled by similarly qualified applicants outside the protected class. <u>Brinkley v. Harbour Recreation Club</u>, 180 F.3d 598, 607 (4th Cir. 1999).

-10-

Community Affairs v. Burdine, 450 U.S. 248 (1981)).  Once plaintiff has established a *prima facie* case, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the termination.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 ((1981).  This is merely a burden of production, not of persuasion.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).   Once the defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination *vel non*."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)).  In other words, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by the defendant is not its true reasons, but were pretext for discrimination.  Reeves, 530 U.S. at 143.  During all of the burden shifting scheme set forth in McDonald Douglas, the ultimate burden of proving that defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against her based on her race.  It is not necessary to decide "whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."[11]   Hawkins v. Pepsico, 203 F.3d 274, 279 (4thCir. 2000)(quoting and citing DeJarnette v. Corning, Inc., 133 F.3d 293, 299(4th Cir. 1998); DeJarnette, 133 F.3d at 299 ("[T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination ...."

---

[11] "Proof that the employer's proffered reasons is unpersuasive, or even obviously contrived, . . . does not necessarily establish that [plaintiff's] proffered reason (race discrimination) . . . is correct."  Reeves, 530 U.S. at 146-47.  "It is not enough to disbelieve the [employer]."  Love-Lane v. Martin, 355 F.3d 766, 788 (4th Cir. 2004).  Plaintiff must show a reasonable jury could "believe [his] explanation of intentional race discrimination."  Id.

(internal quotation marks omitted)); Henson v. Liggett Group, Inc., 61 F.3d 270, 277 (4th Cir.1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including workplace reorganization, as long as the employer does not violate the ADEA."); Jiminez v. Mary Washington College, 57 F.3d 369, 377 (4th Cir.1995) ("Title VII is not a vehicle for substituting the judgment of a court for that of the employer"). It is the perception of the employer that is critical. Hawkins, 203 F.3d at 280. Even a reasoned decision based on incorrect facts is not evidence of pretext. Pollard v. Rea Magnet Wire Co., 824 F.3d 557, 559 (7th Cir. 1987), cert. denied, 484 U.S. 977 (1987).

Even if defendant's reasons are inconsistent, it does not make plaintiff's case viable. See Machinchick v. PB Power, Inc., 398 F.3d 345 (5th Cir. 2005)( employee must put forward evidence rebutting each one of employer's nondiscriminatory explanations for employment decision at issue); Olsen v. Marshall & Ilsley Corporation, 267 F.3d 597,601 (7th Cir. 2001)(plaintiff must show each of defendant's reasons is pretextual to withstand summary judgment); see also Chapman v. A.I. Transport, et al., 229 F.3d 1012, 1037 (11th Cir. 2000)(stating in dicta that plaintiff must produce sufficient evidence to refute each of the employer's proffered reasons). In Olsen, the Seventh Circuit did note an exception to this rule that they have recognized. "'There may be cases in which the multiple grounds offered by the defendant for the adverse action . . . are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment' by pointing out the pretextual nature of one reason." Id. (citing and quoting Wolf v. Buss (America), Inc., 77 F.3d 914, 920 (7th Cir. 1996).

### Pretext Analysis

There is no dispute that plaintiff satisfies the first element of the *prima facie* case and that

-12-

he was qualified for the job. However, defendant challenges plaintiff's *prima facie* case on the last two elements and whether or not plaintiff's job performance was satisfactory.

Defendant asserts that plaintiff's job performance was not satisfactory because he refused to work the hours demanded by his employer. The issue is whether or not it was a reasonable expectation of defendant to expect plaintiff to accept the transfer to the Late Shift.

At deposition, plaintiff admitted that Mr. Logan would not commit to making special arrangements for plaintiff if the day came where the shift had to change. Although plaintiff states that it was clear that his schedule would only include the day shift hours, it is inherent, even in the light most favorable to the plaintiff, in his other testimony cited above that a potential shift in hours was contemplated. On the other hand, Mr. Logan was well aware of plaintiff's predicament with his school schedule. Although plaintiff presents conclusory statements regarding the veracity of the creation and need for the Late Shift, he fails to present specific facts sufficient to refute the explanation set forth by defendant.

Thus, plaintiff fails to present an issue of fact on this portion of the second element of the *prima facie* case.

Defendant also challenges whether or not plaintiff suffered an adverse employment action.

Conduct short of "ultimate employment decisions – to hire, discharge, refuse to promote, etc. – can constitute an adverse employment action under Title VII." Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001). Retaliatory harassment also can constitute an adverse employment action. Id. (Citing Ross, 759 F.2d at 363). Plaintiff must establish that the challenged discriminatory acts of harassment adversely affected "the terms, conditions, or benefits" of her employment. Id. (citing Munday v. Waste Mgmt. Of North America, Inc., 126 F.3d 239,243 (4th Cir. 1997)). Thus, plaintiff

must show (1) acts or harassment which (2) adversely affected (3) the terms, conditions, or benefits of her employment.

Plaintiff must show that the change was significant. See Von Gunten, 243 F.3d at 868 (a significant change in job assignment can adversely effect a person's terms, conditions and benefits of employment); See generally  Burlington Industries, Inc. v. Ellerth, 118 S.Ct. 2257, 2268 (1998)("A tangible employment action constitutes a significant change in employment status, such as...a decision causing a significant change in benefits."); Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981); Crady v. Liberty Nat. Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993)("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."); cf. Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 887 (6th Cir. 1996)(demotion without change in pay, benefits, duties or prestige insufficient);  Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994)(reassignment to a more inconvenient job insufficient); Williams v. Bristol-Myers Squibb, 85 F.3d 270, 274 (7th Cir. 1996)(A transfer that does not involve a demotion in form or substance does not rise to the level of an adverse employment action).

Defendant argues that its decision to transfer him to the 11-7:30 shift and to terminate his employment when he refused to accept the transfer do not amount to an adverse employment action.

Plaintiff appears to argue that the adverse employment action was the termination of plaintiff's employment and that it was well understood between plaintiff and defendant that school dictated his available hours of employment; that a new "Late Shift" was created and only existed for a short period of time; and that defendant knew plaintiff would not agree to work the "Late Shift"

-14-

which in effect constructively discharged him.

A transfer to the Late Shift does not arise to the level of adverse employment action. However, in the light most favorable to the plaintiff, his employment was terminated because he would not agree to the change in work hours. Therefore, on the termination claim, plaintiff satisfies the third element of the *prima facie* case.

Defendant admits that it hired a white employee to replace plaintiff and that the white employee agreed to work the 11-7:30 shift. Therefore, the plaintiff satisfies the fourth element of his *prima facie* termination claim. However, plaintiff fails to meet the fourth element regarding the transfer to Late Shift. Plaintiff was the third spray applicator transferred. Of the first two transferred and the two who were not transferred, two were white and two were African-American. Although plaintiff presents conclusory statements challenging the veracity of the decision to create the Late Shift and the need to transfer him to that shift, it amounts to no more than conclusory allegations.

Defendant proffers its legitimate, nondiscriminatory reasons for its actions. Defendant presents deposition testimony that its production demands resulted in the creation of the 11-7:30 shift; that Willie Page then Josh Joye were placed on the shift after which plaintiff was directed to work the Late Shift. Defendants present evidence that plaintiff was the least experienced of the three spray applicators remaining and defendant needed the two best spray applicators on the day shift. Upon plaintiff's refusal to transfer to the Late Shift, his employment was terminated. Therefore, its reason for the transfer was they needed a spray applicator on the Late Shift and they did not want to move the other two spray applicators because they were better at the job and they needed them on day shift. The reason for termination was that plaintiff failed to accept the transfer to the Late Shift when told to do so. Plaintiff's memorandum does not directly address defendant's proffered reasons.

-15-

Plaintiff did present over 100 pages of attachments to his memorandum without citation to any particular page. The undersigned has reviewed the attachments and included the obvious facts.[12] As stated above, plaintiff presents conclusory statements about the legitimacy of the need for the Late Shift and his placement on the Late Shift crew. However, he fails to present specific facts necessary to defeat a motion under Rule 56. Additionally, as set forth above, it is not necessary to decide "whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."[13]     Hawkins v. Pepsico, 203 F.3d 274, 279 (4thCir. 2000)(quoting and citing DeJarnette v. Corning, Inc., 133 F.3d 293, 299(4th Cir. 1998); DeJarnette, 133 F.3d at 299 ("[T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination ...." (internal quotation marks omitted)); Henson v. Liggett Group, Inc., 61 F.3d 270, 277 (4th Cir.1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including workplace reorganization, as long as the employer does not violate the ADEA."); Jiminez v. Mary Washington College, 57 F.3d 369, 377 (4th Cir.1995) ("Title VII is not a vehicle for substituting the judgment of a court for that of the employer"). It is the perception of

---

[12]   Rule 56 does not impose upon the District Court a duty to sift through the record in search of evidence to support a litigant's arguments on summary judgment. Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994), cert. denied, 115 S.Ct. 195 (1994); Malina v. Baltimore Gas & Elec., 18 F.Supp.2d 596, 604 (D.Md. 1998); Hayes v. North State Law Enforcement Officers Ass'n, 10 F.3d 207, 215 (4th Cir. 1993), cert. denied sub nom, Price v. City of Charlotte, 420 U.S. 1116 (1997).

[13]   "Proof that the employer's proffered reasons is unpersuasive, or even obviously contrived, . . . does not necessarily establish that [plaintiff's] proffered reason (race discrimination) . . . is correct." Reeves, 530 U.S. at 146-47. "It is not enough to disbelieve the [employer]." Love-Lane v. Martin, 355 F.3d 766, 788 (4th Cir. 2004). Plaintiff must show a reasonable jury could "believe [his] explanation of intentional race discrimination." Id.

the employer that is critical. <u>Hawkins</u>, 203 F.3d at 280. Even a reasoned decision based on incorrect facts is not evidence of pretext. <u>Pollard v. Rea Magnet Wire Co.</u>, 824 F.3d 557, 559 (7th Cir. 1987), <u>cert</u>. <u>denied</u>, 484 U.S. 977 (1987). Plaintiff fails to present sufficient evidence from which a reasonable juror could conclude that defendant's decision to transfer him to the Late Shift, to create the Late Shift, or to terminate his employment when he refused to accept the transfer was based on his race. In the light most favorable to the plaintiff, the decision to transfer him to the Late Shift was unfair to him and it placed him in the difficult position of choosing between his job and continuing his education. However, it is another matter to relate that decision to intentional race discrimination. Accordingly, defendant's motion for summary judgment on plaintiff's disparate treatment claim should be granted.

### Price-Waterhouse Analysis

Plaintiff may also proceed under the mixed-motive method of establishing intentional discrimination. Under this method, a plaintiff must present sufficient evidence, direct or circumstantial, that, despite the existence of legitimate, nondiscriminatory reasons for the adverse employment action, an illegal factor (i.e., race) was a motivating factor in the decision. <u>Hill</u>, 354 F.3d at 284-86. Plaintiff need not show race was the sole motivating factor but only that it was a motivating factor. <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003). The racial bias must come from a relevant decisionmaker.[14] Also, the protected trait "must have actually played a role in the employer's decision making process and had a determinative influence on the outcome." <u>Hill</u>, 354 F.3d at 286.

---

[14] <u>See</u> <u>Hill</u>, 354 F.3d at 291 ("an employer will be liable not for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision.").

In his memorandum, plaintiff asserts that he intends to present direct evidence of discriminatory intent (p.17) and that the establishment of the "late shift" was "a cover-up" of defendant's discriminatory intention to terminate plaintiff's employment. Again, plaintiff fails to present sufficient evidence upon which a reasonable juror could conclude that defendant's actions were based on, in whole or in part, race.

### Constructive Discharge Claim

Plaintiff asserts that by requiring plaintiff to transfer to the 11-7:30 shift knowing it would conflict with plaintiff's school schedule, defendant constructively terminated plaintiff's employment.

Plaintiff alleges this cause of action under §1983. As state above there is no state action. Thus, this claim has no merit. Additionally, to the extent this relates to his Title VII claim, it is addressed above and in the light most favorable to the plaintiff, he was discharged.

### Retaliation Claim

42 U.S.C. §2000e-3(a) provides, in relevant part, as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.[15]

In order for plaintiff to state a *prima facie* case for retaliation under the opposition clause,

---

[15] The Civil Rights Act of 1991 amended Title VII with §2000e-2(m) to provide that a statutory violation has occurred if race, color, religion, sex or national origin was a motivating factor for an adverse action. However, the Civil Rights Act of 1991 did not amend §2000e-3(a), the retaliation statute. See Kubicka v. Ogden Logistics Services, 181 F.3d 544, 552, note 7 (4th Cir. 1999); Egbuna v. Time-Life Libraries, Inc,, 95 F.3d 353, 355 note 2 (4th Cir. 1996). Accordingly, plaintiff must proceed under the analysis set forth in McDonnel Douglas.

he must show (1) he engaged in a protected activity, (2) defendant took adverse employment action against him, and (3) a causal connection existed between the protected activity and the adverse action. Matvia v. Bald Head Island Management, Inc., 259 F.3d 261, 271 (4th Cir. 2001);  Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985).

In order to establish the requisite causal connection, plaintiff must proffer evidence which establishes that he would not have been terminated but for his protected activity. Hopkins v. Baltimore Gas & Electric Co., 77 F.3d 745, 755 (4th Cir. 1996); See Huang v. Bd. of Gov.of the Univ. of N. C., 902 F.2d 1134 (4th Cir. 1990)(addressing "but for" standard in First Amendment retaliation case).

To establish "protected activity" plaintiff must show that he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring.  Bigge v. Albertsons, Inc., 894 F.2d 1497, 1503 (11th Cir.1990); see also Ross, 759 F.2d at 355 n. 1 (stating that a Title VII oppositional retaliation claimant need not show that the underlying claim of discrimination was in fact meritorious in order to prevail).  "The inquiry is  therefore (1) whether [plaintiff] "subjectively (that is, in good faith) believed" that the district had engaged in a [illegal practice], and (2) whether this belief 'was objectively reasonable in light of the facts,' a standard which we will refer to as one of 'reasonable belief.'"  Peters v. Jenney, 327 F.3d 307 (4th Cir. 2003)(citing Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1312 (11th Cir.2002)).

Although it is not necessary that he show a meritorious Title VII claim, he must at least show a reasonable belief that the employment practice did violate Title VII.

Plaintiff claims that he was involved in the protected activity of "the right to have defendant honor his working hours agreement" (Plaintiff's Mem. at 22).  This simply does not qualify as

-19-

protected activity as contemplated by the anti-retaliation statute.

For the foregoing reasons, it is **recommended** that defendant's motion for summary judgment (Document # 7) be **granted**.

July 1, 2005                                    s/Thomas E. Rogers, III
Florence, South Carolina                        Thomas E. Rogers, III
                                                United States Magistrate Judge

**The parties' attention is directed to the important notice contained on the following page.**

-20-

## <u>Notice of Right to File Objections to Magistrate Judge's "Report and Recommendation"</u>
### <u>&</u>
### The <span style="font-variant:small-caps">Serious</span> Consequences of a Failure to Do So

   The parties are hereby notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within ten (10) days of the date of service. 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail. Fed. R. Civ. P. 6. A magistrate judge makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge. *See* <u>Mathews v. Weber</u>, 423 U.S. 261, 270-271 (1976); and <u>Estrada v. Witkowski</u>, 816 F. Supp. 408, 410, 1993 U.S.Dist. LEXIS® 3411 (D.S.C. 1993).

   During the ten-day period for filing objections, <u>but</u> <u>not</u> <u>thereafter</u>, a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he or she wishes the United States District Judge to consider any objections. Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections. *See* <u>Keeler v. Pea</u>, 782 F. Supp. 42, 43-44, 1992 U.S.Dist. LEXIS® 8250 (D.S.C. 1992); and <u>Oliverson v. West Valley City</u>, 875 F. Supp. 1465, 1467, 1995 U.S.Dist. LEXIS® 776 (D.Utah 1995). Failure to file written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge. *See* <u>United States v. Schronce</u>, 727 F.2d 91, 94 & n. 4 (4th Cir.), *cert. denied*, <u>Schronce v. United States</u>, 467 U.S. 1208 (1984); and <u>Wright v. Collins</u>, 766 F.2d 841, 845-847 & nn. 1-3 (4th Cir. 1985). Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he or she did not object. In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues. <u>Howard v. Secretary of HHS</u>, 932 F.2d 505, 508-509, 1991 U.S.App. LEXIS® 8487 (6th Cir. 1991). *See also* <u>Praylow v. Martin</u>, 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied*, 474 U.S. 1009 (1985). In <u>Howard</u>, <u>supra</u>, the Court stated that general, non-specific objections are *not* sufficient:

> A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless. * * * This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. * * * We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.

*Accord* <u>Lockert v. Faulkner</u>, 843 F.2d 1015, 1017-1019 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

> Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review. * * * A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.

*See also* <u>Branch v. Martin</u>, 886 F.2d 1043, 1046, 1989 U.S.App. LEXIS® 15,084 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and <u>Goney v. Clark</u>, 749 F.2d 5, 7 n. 1 (3rd Cir. 1984)("plaintiff's objections lacked the specificity to trigger *de novo* review"). This notice, hereby, apprises the plaintiff of the consequences of a failure to file specific, written objections. *See* <u>Wright v. Collins</u>, <u>supra</u>; and <u>Small v. Secretary of HHS</u>, 892 F.2d 15, 16, 1989 U.S.App. LEXIS® 19,302 (2nd Cir. 1989). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections addressed as follows:

Larry W. Propes, Clerk
United States District Court
Post Office Box 2317
Florence, South Carolina 29503

-21-
